## TEXAS CO. v. WALKER.
### No. 9966.

Court of Civil Appeals of Texas. Galveston.
Dec. 18, 1934.

Rehearing Denied Jan. 17, 1935.

A. M. John and Wm. E. Loose, both of Houston, for appellant.

Walter F. Brown and H. Fletcher Brown, both of Houston, for appellee.

LANE, Justice.

L. Walker brought this suit against the Texas Company, a corporation, to specifically enforce a certain written contract, hereinafter set out, praying for judgment for damages for the alleged failure of the Texas Company to perform its part of said contract, for the establishment of his right to the overriding royalty mentioned in said contract, and for judgment requiring the Texas Company to specifically perform that part of said contract providing for payment to plaintiff of said overriding royalty, and for such other and further relief, general and special, legal and equitable, as he might be found entitled to.

The contract entered into between the parties, sought to be enforced, reads as follows:

"Houston, Texas, July 26th, 1927.
"Subject: Proposed Drilling Prospect—Brazoria County, Texas.
"Mr. L. Walker, Houston, Texas.
"Dear Sir: With reference to the proposed drilling prospect in Brazoria County, Texas, which you have brought to the attention of The Texas Company, on which you advise certain geophysical work has been done and substantial evidence of the existence of a salt dome discovered by means of such geophysical methods:

"It is understood that you will furnish all maps and information in your possession concerning the area in question, and assist The Texas Company in every way possible to assemble the block of acreage which we understand shall consist of not less than 2,300 acres of land at a cost to The Texas Company not exceeding $2.50 per acre.

"When you have furnished such maps and information it is agreed that The Texas Company shall proceed at its own cost and expense to assemble the block of acreage in question for the purpose of drilling tests, in an effort to locate and prove the existence of a salt dome. Such drilling, however, to be at the option and judgment of The Texas Company, and in no event shall The Texas Company be obligated against its wish or option to drill or otherwise carry on operations hereunder.

"We agree to carry you for a 1/32nd overriding loyalty on all leases acquired by The Texas Company in this proposed prospect. However, in the event any property or lease now owned by The Texas Company shall be embraced within said prospect or located in the vicinity of said prospect, it is understood and agreed that you will not be entitled to any royalty on such lands.

"When we have satisfied ourselves, either by drilling operations or otherwise, that a salt dome exists on said block of acreage, we agree to pay you, in addition to the over-riding royalty above mentioned, the sum of $4,950.00. It is distinctly understood and agreed, however, that said $4,950.00 shall not be due and payable unless and until The Texas Company has been satisfied that a salt dome exists on said block.

"The sum of $50.00 is hereby paid you as a consideration for the options herein granted.

"You will note your acceptance on a copy hereof.

"Yours very truly,
"The Texas Company,
"By W. R. Thomas.
"Accepted: L. Walker.'"

The Texas Company paid Walker the $50 mentioned in the contract for the option specified thereby.

The plaintiff alleged that upon the execution of the contract and the payment of the $50 by the Texas Company to him he "furnished to the defendant two maps showing the location of the area referred to in said contract and informed the defendant as to where the said dome was located, and informed the defendant that he would cooperate with the defendant in every way possible and would secure and furnish to the defendant any other information that it desired which could be procured by him, and that he offered to assist the defendant in every way possible to assemble the block of acreage referred to in said contract; that the information so furnished by plaintiff to the defendant was received and accepted by the defend-

ant without question and the sufficiency of such information was not questioned by the defendant; that the defendant still has in its possession the maps referred to, and it is here notified to produce same upon the trial of this cause or secondary evidence of the contents of such maps will be offered; that if defendant had availed itself of the services of the plaintiff, plaintiff could and would have secured the acreage referred to in said contract, under the terms mentioned therein; that while the defendant did not avail itself of the services of the plaintiff in assembling the block of acreage around said prospect and securing leases thereon, the defendant did on the 27th day of November, 1928, and on various other dates from then until the present time, the exact dates of which plaintiff cannot give, but which are well known to the defendant, proceed to assemble the block of acreage constituting such drilling prospect and did secure oil, gas and mineral leases on the lands constituting the acreage covered by such drilling prospect; that the defendant did satisfy itself that a salt dome exists on said block of acreage, the exact date when the defendant so satisfied itself being unknown to the plaintiff but being well known to the defendant; that the defendant drilled two wells for oil and gas on said drilling prospect, discovering therein strata of sands containing oil in paying quantities and containing gas in huge and paying quantities; that the plaintiff cannot state with certainty when said wells were begun and when they were completed, nor can he state with certainty when it was that the defendant discovered in said well the sands referred to, but these dates are well known to the defendant; that oil and gas were not developed by the defendant in the first well drilled, but were developed by the defendant in the second well drilled, and the defendant is now proceeding to drill other wells on the land included in said drilling prospect. That a salt dome exists on said block of leases and the evidence demonstrates, both geophysically and by drilling, that such salt dome exists under said block and that oil and gas are to be found there in paying quantities. That if the defendant is not satisfied of the existence of such dome, it is because the defendant arbitrarily refuses to be satisfied of the existence thereof."

Following such allegations, plaintiff described certain leases taken by defendant in said prospect area, and alleged that he had demanded of defendant the one thirty-second overriding royalty mentioned in the contract;

that defendant had refused to assign same to him; that by such refusal on the part of defendant, and plaintiff's consequent inability to dispose of it at a larger value, which later prevailed, he had been damaged; that the Texas Company had satisfied itself that a salt dome existed under "said block of acreage," indicating the existence of oil thereunder, and under the terms of said contract it was due plaintiff the $4,950; and that by reason of the matters and things stated he was entitled to his one thirty-second royalty on production taken by defendant from said "block of acreage."

Plaintiff further alleged that "at the time plaintiff and defendant entered into said contract, the plaintiff held said contract and all rights and interests thereunder in trust for himself and for one Charles Gehrmann, but the said Charles Gehrmann has transferred and assigned to the plaintiff said contract, and all rights thereunder, and plaintiff has been the sole owner thereof at all times since long prior to the filing of this suit. That said Charles Gehrmann has no interest whatever in the cause of action forming the basis of this suit."

Such allegations were followed by the following prayer: "Plaintiff prays for judgment against the defendant for his said damages, interest and costs of suit, and establishing his rights to said over-riding royalty; that the defendant be required to specifically perform its contract to pay such over-riding royalty to the plaintiff; and that plaintiff have such other and further relief, general and special, legal and equitable, as the nature of his case may require."

Defendant answered by general denial, and substantially specially pleaded:

"(1) The falsity of the material representation of appellee to appellant that appellee had in his possession substantial geophysical evidence of the existence of a salt dome, and a total failure of appellee to furnish appellant any geophysical evidence of a salt dome, as contemplated by the contract; amounting to such fraud as to vitiate the contract.

"(2) As an alternative to the allegations of falsity in appellee's representation as to his having in his possession substantial geophysical evidence of a salt dome, appellee's own default in performance and breach of the contract provision (clear on its face, or if ambiguous, intended by the parties), that appellee would furnish appellant substantial geophysical evidence of such salt dome, and consequent failure of consideration from appellee to appellant.

"(3) Appellant's election, with notice to appellee, not to 'otherwise carry on operations' under the contract, putting the same at an end; such right of election being plainly given by the contract, or, if same was ambiguous, intended by the parties.

"(4) Estoppel of appellee to recover, and waiver of his right to recover on the contract because appellee, after notice appellant would not proceed thereunder, treated the information, which was the subject matter of the contract, as his own, and industriously endeavored to sell, and did sell, the same to Navarro Oil Co., and to others—competitors of appellant—appellant thereafter having the right from appellee's such actions to assume the contract at an end, and acting on information 'other than that as suggested by the plaintiff' (appellee), more than two years after the date of Walker's contract procuring leases on the area described in appellee's petition.

"(5) Conduct of appellee destroying his right to recover on the contract, in that, while appellant, relying on information elsewhere procured, was assembling the blocks of acreage which is the subject-matter of the suit, appellee, instead of assisting appellant to procure the leases at $2.50 per acre, did everything in his power to turn the acreage to appellant's competitors, and to increase the price of acquiring same, thus himself fraudulently repudiating the contract.

"(6) Abandonment of the contract and all rights thereunder by appellee.

"(7) Impossibility of procuring 2,300 acres of land for lease in the area contended for by appellee at $2.50 per acre without a drilling obligation; the fact that the leases were acquired by appellant at an average cost to it in excess of $40.00 per acre, and requiring drilling or annual rental payments greatly in excess of $2.50 per acre; that performance by appellee being impossible, he was not entitled to recover.

"(8) Mutual rescission, and release from appellee to appellant; reliance by appellee thereon, enormous subsequent expenditures by appellant; and consequent estoppel of appellee to assert otherwise.

"(9) The four-year statute of limitations.

"(10) The two-year statute of limitations.

"(11) Laches of appellee in permitting appellant to make enormous expenditures, while appellant, to appellee's knowledge, believed the contract at an end, and after appellee had rescinded and exercised dominion over the information he had contracted to appel-

lant, and unreasonably delaying his demand for over-riding royalties, speculating upon appellant's effort and expenditure.

"(12) That the contract was so indefinite as to the lands involved as to be within and barred by the statute of frauds."

As counsel for the plaintiff has made no attempt in his brief to state the pleadings of the parties, nor raised any objection to the statement of such pleadings as made by counsel for the defendant, we have substantially restated such statement as our own.

The case was submitted to a jury upon special issues, in answer to which the jury found:

(1) Appellee furnished defendant all maps and information in his possession concerning the area referred to in the contract copied above.

(2) That a salt dome exists on the block of acreage referred to in the contract.

(3) That the Texas Company has satisfied itself by drilling operations, or otherwise, that such salt dome exists.

(4) And did so satisfy itself on October 22, 1928.

(6) That the leases still in force are within the proposed prospect referred to in said contract.

(10) That such leases had decreased in value since the completion of the well known as Ewing No. 1.

(11, 12) That such decrease has resulted in damages to plaintiff in the sum of $20,678.75.

(13) That Walker represented to the Texas Company, before the execution of the contract involved, that he had in his possession and control substantial geophysical evidence of the existence of a salt dome underlying a specific area in Brazoria county, Tex.

(14) That the Texas Company relied upon such representations.

(15) That such representation was not false.

(16) That the Texas Company's agent did not notify Walker that defendant would not carry out or perform said contract.

(18) That it was shown by a preponderance of the evidence that the Texas Company some time after July 26, 1927 (the date of the contract), could have assembled a block of acreage consisting of not less than 2,300 acres of land at a cost to it not exceeding $2.50 per acre in the proposed drilling prospect in Brazoria county, Tex., which Walker brought to the attention of said company.

(19, 20) That Walker, prior to December 10, 1929, after entering into the contract of July 26, 1927, did not furnish to Navarro Oil Company, or to H. R. Cullen, such information, if any he had, as to the location of a probable salt dome in Brazoria county, Tex., covered by the contract with the Texas Company.

(21) That they did not find from the evidence that prior to November 24, 1929, Walker and W. R. Thomas, agent of the Texas Company, agreed that Walker should be entirely released and discharged from the obligations of the contract of July 26, 1927.

(22, 23, 24) That before the execution of the contract of July 26, 1927, sued upon herein, the plaintiff, Walker, represented to the defendant's agent, W. R. Thomas, in substance and in effect, that an area of not less than 2,300 acres of land in Brazoria county, Tex., containing a salt dome, could be leased by the Texas Company with his assistance at a total cost to the Texas Company not exceeding $2.50 per acre; that W. R. Thomas believed such representations to be true; and that they could not find from the evidence that such representations were false.

(24-A) That W. R. Thomas acted upon such representations, which induced him to sign the contract of 1927.

(25 to 40, inclusive) The Texas Company, with the co-operation and assistance of the plaintiff, could, within a reasonable time after the execution of the contract of July 26, 1927, have procured oil and gas leases on fifteen tracts of land, aggregating more than 2,300 acres in the vicinity of the proposed prospect block of acreage, at a maximum cost to said company of $2.50 per acre, and on terms satisfactory to said company.

At the close of the evidence, defendant moved the court in writing to instruct a verdict in its behalf, and, after the return of the verdict, defendant moved for judgment in its favor, notwithstanding the verdict. Both of such motions were refused.

Having so disposed of said motions, judgment was rendered for the plaintiff against defendant upon the verdict of the jury: (1) For an overriding royalty interest of one thirty-second of all the gross oil, gas, and other minerals produced and saved since April 30, 1932, and such as were produced and saved after the date of the judgment from and under fifty-three tracts of land leased by the Texas Company in the vicinity of the prospect block of acreage hereinbefore mentioned, containing an aggregate of 5,000 or more acres; (2) investing title to said one thirty-second royalty in plaintiff and divest-

ing same out of defendant; (3) for the sum of $20,678.75, same being the item of damage found by the jury in response to special issue No. 12; (4) for $4,950 upon a finding of the court that defendant had satisfied itself that a salt dome existed on the block of acreage, the subject-matter of the contract of July, 1927, together with $709.80 as interest thereon, and for $2,557.75, same being one thirty-second of the reasonable market value of the oil produced and saved from and under all of the fifty-three tracts leased by the defendant from September 9, 1931, to April 30, 1932, all of which sums aggregate $28,896.30.

From the judgment rendered, the Texas Company has appealed.

The transcript in this case contains 460 pages. The statement of facts 2,012 pages, together with numerous maps as exhibits. The transcript contains 482 assignments of error by appellant, and about 200 special issues requested by appellant. Appellant's brief is in two volumes, covering at least 450 printed pages, and appellee's brief covers 151 printed pages.

It is apparent from the statement made that this court is called upon to perform much unnecessary labor in disposing of this appeal. However, we must proceed to decide the pertinent and material issues discoverable from the mass of matter mentioned.

Appellant, for reversal of the judgment, contends that the trial court erred in refusing its requested peremptory instruction in its behalf at the close of the evidence because:

"(1) The contract by plain and unambiguous language obligated Walker as a condition to his right to receive either the $4,950.00 or the overriding royalty to furnish to The Texas Company substantial geophysical evidence of the existence of a salt dome in at least 2,300 acres of land in Brazoria County, which could be and which was in fact leased by The Texas Company without a drilling obligation and at a cost to it of not exceeding $2.50 per acre— and whether the information was in his possession or that of his partner Gehrmann.

"(2) Walker did not plead the performance of any or of all of these conditions precedent.

"(3) Walker introduced no evidence that he had performed either or all of these conditions precedent.

"(4) The undisputed evidence shows that Walker did not furnish to The Texas Company substantial geophysical evidence of the existence of a salt dome at any place.

"(5) The evidence is undisputed that Walker did not furnish to The Texas Company the geophysical information, if such it was, in the possession of his partner Gehrmann for and in behalf of whom the contract was made."

(6) That "the peremptory instruction should have been granted because the undisputed evidence showed appellee failed to perform the major obligation imposed on him by the contract to furnish The Texas Company all information in his possession (the obligation legally including the information possessed by his partner and agent Gehrmann, who had all the geophysical information, if any, the mere hearsay and inexpert conclusions from which Walker attempted to pass to The Texas Company as hearsay)."

(7) That "the peremptory instruction should have been granted because the undisputed evidence showed that Walker abandoned any right he might have had to specifically enforce the contract in suit, by divulging to strangers, and competitors of The Texas Company, the prospectiveness of the alleged area of his contract with The Texas Company, and endeavoring to persuade holders of lands in the alleged proposed prospect to turn their leases to others than The Texas Company."

Appellant also contends that the trial court erred in refusing to render judgment in its favor notwithstanding the verdict of the jury (1) because there was no evidence to support a judgment for the appellee, and (2) that there were no findings of a fact or facts by the jury that would support a judgment for appellee.

■ We sustain appellant's contentions. There is no allegation in plaintiff's petition that he furnished defendant substantial geophysical evidence of the existence of a salt dome underlying the area in question, discovered by means of geophysical methods, as he agreed to do, nor that had defendant surrendered its option at any time plaintiff could have sold this information he promised to deliver to defendant at any price whatever, nor is there any evidence to support a finding that he could have done so. Therefore, he is not entitled to a recovery on the theory that he did furnish such information, or that he could have sold such information to some one else had defendant surrendered its optional contract. It is evident from Walker's pleading and contentions that he is asking recovery only upon the ground that defendant did not drill or otherwise carry on operations in the area in question under the contract.

As an inducement to the Texas Company to enter into the contract, Walker, as shown by the unambiguous terms thereof, agreed to furnish the company all maps and information

in his possession concerning the area in question, including substantial evidence of the existence of a salt dome underlying the land, discovered by means of geophysical methods, and he also agreed by the terms of the contract that in the event the company entered into the contemplated contract, that he would in every way possible assist the company to assemble a block of acreage to consist of not less than 2,300 acres of land at a cost to the Texas Company not exceeding $2.50 per acre.

The Texas Company by the contract on its part agreed that if and when Walker furnished such maps and information, including substantial evidence of the existence of a salt dome under the area in question, discovered by means of geophysical methods, then the company would proceed at its own cost and expense to assemble the block of acreage in question for the purpose of drilling tests in an effort to locate and prove the existence of a salt dome, providing, however, that such drilling should be at the option and judgment of the Texas Company, and in no event should the Texas Company be obliged against its wish or option to drill or otherwise carry on operations under the contract.

■ The effect of the fourth and fifth paragraphs of the contract, considered with the foregoing paragraphs, is that the Texas Company agrees if and when Walker performs his obligations undertaken by the contract, and if and when the Texas Company avails itself of the option purchased and thereunder drills for oil, and only then, to carry Walker for a one thirty-second overriding royalty on all leases acquired by the Texas Company in the area in question, except leases theretofore owned by said company in such area or in the vicinity thereof.

The same may be said of the agreement to pay Walker $4,950. The proper construction to be given to the next to the last paragraph of the contract, when considered with the foregoing paragraphs, which should necessarily be done, is that the Texas Company agreed that if it should avail itself of the option purchased, after Walker had performed his obligations and undertakings under the contract, and if it had, acting upon the information furnished by Walker, satisfied itself by either drilling operations or otherwise that a salt dome existed on the area in question, to pay Walker the sum of $4,950.

■ We think it clear that by the terms of the contract the Texas Company assumed no obligation to develop the area referred to, but that it only purchased an option to so develop. By no reasonable construction of the contract can it be said that the Texas Company agreed to make any kind of development of the area in question until Walker had furnished it all the maps and information that he represented to the company he possessed concerning the area, and not until the company had, with the assistance of Walker, been able by leases to assemble a block of acreage not less than 2,300 acres, at a cost to said company not to exceed $2.50 per acre.

At the risk of repetition, we say that it is clear from the contract that Walker represented to the Texas Company that he was in possession of substantial geophysical evidence of the existence of a salt dome underlying certain surveys of land in Brazoria county, Tex., which had been discovered by means of scientific geophysical methods, which evidence he proposed to sell to the Texas Company. That the Texas Company, wishing to procure leases on land of the nature represented by Walker, entered into the letter contract with Walker. Such contract is purely an optional contract for which the Texas Company paid Walker $50.

It is also apparent from the contract that Walker had agreed by the terms of the contract to furnish said company with substantial evidence of the existence of a salt dome underlying the area of 2,300 acres which had been discovered by means of geophysical methods.

By no reasonable construction can the two clauses of the contract, one referring to the one thirty-second overriding royalty, and the other to the payment of $4,950, be considered as complete independent obligations within themselves, unconnected with the provisions of the foregoing clauses of the contract. Clearly the obligation to pay such royalty and sum of money mentioned depends upon the carrying out of the terms of the foregoing clauses of the contract. In other words, the payment of the royalty and the $4,950 depends upon whether or not the Texas Company is compelled to avail itself of the option purchased. Whether or not Walker is entitled to the royalty and payment of the $4,950 mentioned in the optional contract must depend upon the terms of the contract when read as a whole, and whether or not Walker furnished the information he represented to the Texas Company he had relative to a salt dome underlying the area in question; that is, that such salt dome had been discovered by means of geophysical methods, and whether or not, upon such information, the Texas Company under its option began operations on the area.

Walker's furnishing the Texas Company substantial evidence of the existence of a salt dome underlying the area of 2,300 acres, obtained by means of scientific geophysical methods, and the ability of the company to lease 2,300 acres within the area pointed out by Walker at a cost to the company not to exceed $2.50 per acre, were matters precedent to the duty of appellant to in any manner carry on operations on the area in question, in that the contract specially provides that "when you (Walker) have furnished such maps and information (that is, substantial evidence that a salt dome underlay the area in question, discovered by means of geophysical methods) it is agreed that The Texas Company shall proceed at its own cost and expense to assemble the block of acreage." The purpose for demanding such information was, no doubt, to furnish the appellant with facts upon which it might reasonably conclude to spend a large sum of money, perhaps $75,000 or more, in assembling 2,300 acres in the area, paying for the leases, and drilling a well or wells in an effort to locate and prove the existence of a salt dome, for only in the event it had such information could it reasonably go to the expense of leasing 2,300 acres and drilling to test the truth of the information given by appellee, Walker, which was not the information promised.

The undisputed evidence shows that Walker, nor any one for him, ever furnished the company with substantial evidence of the existence of a salt dome underlying the area pointed out by him, and it is also shown that within a reasonable time after the execution of the contract by the Texas Company it notified Walker that it would not operate under the optional contract, and declared the contract at an end; and that Walker, after receiving such notice, undertook to lease the acreage in controversy to other parties.

At the time of the execution of the contract, Walker had no leases or other rights to any part of the area pointed out by him. All he proposed by the contract to sell to the Texas Company was substantial evidence, in possession of himself and one Gehrmann, that a salt dome underlay the area in controversy, which evidence had been discovered by means of a scientific geophysical test made by Gehrmann.

Walker testified that he represented to Thomas, contracting agent of the Texas Company, that Gehrmann, his partner at the time, had by means of geophysical methods discovered the existence of a salt dome underlying the area in controversy; that he told Thomas before the contract was executed, and at the time it was executed, that Gehrmann had made a scientific geophysical test of the area and that he would be glad to bring Gehrmann up to Thomas' office at any time. Such testimony is undisputed, but is corroborated by the testimony of Thomas.

Walker testified by deposition that he did not give Mr. Thomas the records made by Gehrmann, because Thomas would not have known what they signified if he had given them to him. Testifying further, Walker said: "I told him (Thomas) about the machine that the doctor used, and told him the box was about 15 or 18 inches long, and about that high, and that the old man had balances across it, and I could see the balances; they were yellow looking, he called it a gold-north on one end of the balance, and the other one had,—it was either isinglass or glass, I don't know which it was, I never had hold of it, because he was very particular of that end; a little fine white looking wire, he called it platinum wire, either platinum or gold wire, one, and that was his balance, and he had a stop-watch there, and he had a thermometer in there to take the temperature in this box. I told him how he worked it, or what he done while he was setting it up; I will get to that in a minute—and that I cleaned the ground off with a shovel, and he would set this down and take a compass to get his bearings, or get his direction, and he would sit down there, then, and get out his—he had a stop-watch, and he would get out and sit down right over that box with his pencil, and he had these figures and dots up and down the side, and he would watch those things and put them down, and he would work for maybe an hour, an hour and a half, to sometimes four hours. Sometimes he said if he had lots of interference it would take him longer. Then, when he got ready to move, he would motion to me, and I went on up there, and he would tell me about where to go, and I cleaned off the ground again, and I would help him move over there, and we would take another station."

He further testified that Gehrmann would not permit anybody to see his machine except witness, and that Gehrmann knew witness did not know anything about geophysical principles and the instrument; that he had no knowledge of the science and art of locating salt domes; that he and Feagin became partners some time in 1927, about August or September of that year.

A. T. Feagin, a witness for appellee, Walker, testified that during the controversy be-

tween Walker and appellant he was the attorney for Walker, was his representative in the controversy; that he, as such attorney and representative, had a conversation with W. R. Thomas in August or September of 1927, only a month or two after the execution of the contract in question, in an effort to induce appellant company to accept the information furnished to it by Walker and to proceed under the contract; that Thomas suggested Feagin bring Dr. Gehrmann to see R. F. Baker, chief geologist for the Texas Company, and have him demonstrate the merits of his machine which he used in his effort to locate the salt dome which Walker represented to appellant, through Thomas, had been discovered to underly the area in question by means of geophysical methods; that Feagin told Thomas that he was quite certain Gehrmann would not see Baker and demonstrate his machine; that Thomas stated to him, Feagin, that he did not want to lease the area without Mr. Baker's approval and that Baker would not approve the project, and suggested to him that he might possibly obtain the approval of Baker if Dr. Gehrmann would take his machine to Baker and convince Baker it was a scientific machine capable of getting geophysical results; and that he, Feagin, told Thomas that Gehrmann would not do so; that he was quite certain that he would not do so; that any way, no such thing was done; that it was then suggested by witness that the approval of Baker might be obtained if he would get Mr. Cortes to see Baker; that Cortes went to see Baker and still Baker refused to approve of the project; that Cortes left witness under the impression that Baker did not favor geophysical work any way; that he knew nothing of this work; Cortes stated to witness that Baker declined—practically declined—to entertain Cortes' proposal that the Vacuum come in for an interest in the project; that he got the impression from Cortes that Baker was not satisfied with geophysical information that Walker and Cortes submitted with regard to the Manvel area; that Thomas told witness that unless he could get Baker's approval he could not go forward with the project; that other than the efforts stated to get Baker's approval, he made none; and that so far as he knew Walker made none.

Testifying further, the witness said that prior to the making of the contract by Walker with the Navarro in February, 1929, the witness had encouraged Walker to try to get some one else to handle the prospect; that he did so because he felt almost certain that the Texas Company would not do so; that he was quite sure on numerous occasions during the negotiations in question he communicated the progress or lack of progress that was being made in the handling of this matter; that it was his duty to do so, to report to Walker such progress or lack of progress; and that he imagined he did so.

Dr. Gehrmann never went to see either Baker or Thomas, and his machine used in compiling Plaintiff's Exhibit Map 3 was never shown or exhibited to either of said parties, nor did Dr. Gehrmann appear and testify in this case and explain the merits of his machine in locating salt domes by geophysical methods. There was no competent evidence to show that Dr. Gehrmann was a geophysicist, or that he had any knowledge of the geophysical manner of locating salt domes by geophysical methods.

A. T. Feagin, attorney and representative of appellee, Walker, testified that Dr. Gehrmann was alive about a month prior to the date upon which he testified, which was Friday, May 13, 1932; that he had communicated with him on the telephone and that he was in Houston and that the Texas Company and their attorneys had made an effort to secure from the witness information as to Dr. Gehrmann's whereabouts, and that witness did not disclose his information as to Dr. Gehrmann's whereabouts at the request of Gehrmann; that he was under obligation to Gehrmann not to disclose his whereabouts; that Gehrmann had no interest whatever in this suit and did not want to be involved in it; that he had told appellant's attorney that the witness could not give any information as to Gehrmann's whereabouts; that Gehrmann had been in Houston some of the time during the last year and some of the time in the East Texas oil field, also in Louisiana; that the witness recalled that the sheriff, in an effort to serve subpœna on Charles Gehrmann, issued on February 16, 1932, had made inquiry of witness as to the location of Gehrmann, and that while it was not exactly correct to say that the reason he felt obligated to conceal from the Texas Company and the sheriff the presence of Gehrmann was that Gehrmann did not want to be required to testify in this lawsuit or to be required to divulge the principles upon which his instrument was constructed and operated; that witness did not believe that Gehrmann would have objected to divulging the general underlying principles upon which the instrument was constructed, but did not think that Gehr-

mann would have exhibited his machine and did not think that he would have given full information as to all the features of the machine; and that that was one of the controlling reasons why Gehrmann did not want to testify in this case and why the witness had concealed from the Texas Company and the sheriff his location.

The undisputed evidence shows that two or more expert witnesses in geophysics testified that so far as they knew there were but three instruments used in the location of salt domes; namely, the tortion balance, the seismograph, and the magnetometer. There is no contention that the instrument used by Gehrmann was one of the instruments mentioned by said expert geophysicists.

Witness Burton McCollum, shown to be an expert geophysicist, being shown Walker's Map No. 3 and after examining it, testified that it is not a geophysical map, nor a tortion balance map. He testified that the phrase "geophysical work" had acquired in oil producing circles in July of 1927 the meaning of work done either by the tortion balance, the seismograph, or the magnetometer.

Of all the witnesses testifying in the case, not one of them stated that either of the maps presented by Walker to appellant or Thomas gave any information or evidence of the existence of a salt dome in any area.

The undisputed evidence shows it was generally known by those interested in the production of oil in and near the vicinity of Brazoria county and in Houston that a showing of oil had been discovered near the H. N. Little survey in Brazoria county for ten or eleven years before the contract in question in this case was executed.

F. C. Sealey, called as a witness for appellee, Walker, on cross-examination, testifying as an expert geologist, said that Walker's maps 2 and 3 contained no geophysical information.

W. G. Saville, testifying as an expert geologist, said that Walker's maps 2 and 3 did not give any geophysical information.

On December 19, 1929, Walker wrote a letter to the Texas Company, an excerpt from which reads as follows: "You will remember that I discussed with you numbers of times the ownerships in there, and the particular leases that could be had, and for a whole year insisted on your going ahead with the leasing, or that you let me lease it for you, but you finally said your geologist, Mr. Baker, wouldn't consent to your taking the leases in there, as he was not exactly satisfied with the area and was not a believer in geophysical work."

On May 26, 1931, Walker wrote the Texas Company a letter wherein it is said: "Later on, Mr. Thomas insisted that the delay was being occasioned by objections to the area on the part of your geologist, Mr. Baker, whom he said was opposed to your company's leasing prospects based on geophysical work. I did everything within my power to induce your company to carry out this contract. Mr. Henry Cortes, who was then and now is with the Coastal Department of the Vacuum Oil Company, called on both your Mr. Thomas and your Mr. Baker, and discussed with each of them the location of our prospect, and its favorable topography and other surface indications, and undertook, when it appeared that The Texas Company would not go forward with the contract, to induce The Texas Company to try and work out with his company an arrangement for the leasing and drilling of the prospect, in which, however, he was unsuccessful, as your company finally declined to do anything with the prospect. On my last visit with Mr. Thomas, when it appeared that nothing would be done by your company in the matter, I tendered back to him the $50.00 earnest payment which your company had made me, and asked him if he would not accept it and release me from the contract so that I might be free to contract the prospect with some other company. This he declined to do."

Both Walker and Feagin admit that neither of them is a geophysicist, and that they know nothing of the science or art of geophysics, and know nothing of the principles of science, if any, used by Dr. Gehrmann in using his machine; that all the information they had was what Dr. Gehrmann told them.

As shown by the testimony of Walker and his agent, Feagin, Walker in effect said to appellant: "I know nothing about geophysics, but take my word for it, or the word of Mr. Cortes, Dr. Gehrmann, who knows what he is doing, made this unexplained, unsupported pencil sketch, and I tell you you can rely on the fact that there is indicated there the 'high' of a salt dome. I can not show you Dr. Gehrmann's figures, and I can not tell you the scientific principle, if any, upon which he worked; and Dr. Gehrmann is unwilling to come in and talk to you or explain to you the scientific principle, if any, upon which he worked; but if you will spend the money necessary to acquire these leases and drill this block, you will find that a salt dome exists upon the area in question."

By argument, counsel for appellee insists that the Texas Company was in fact satisfied with the information furnished by Walker, but pretended not to be so satisfied, and under such pretense went forward with the project and profited by the information furnished by thus attempting to defeat his rights as per the terms of the contract between the parties.

■ If as a fact the Texas Company, pretending dissatisfaction with the information furnished by Walker with which it was actually satisfied, and pretending to exercise its option not to proceed under the contract, had forthwith or shortly thereafter secretly slipped in and taken the leases, doing what it could to keep others out or run others off, so that it could make use of Walker's information without paying therefor, the court would, on a proper pleading, sufficient evidence, and a jury's findings, find some way to make it pay Walker for his information. But this court cannot, in the state of the pleading and evidence, permit a judgment in favor of appellee against appellant to stand upon any theory of fraud upon the part of the Texas Company. Walker made no allegation of fraud, nor proof thereof, but he is in this court endeavoring to use the pressure of his cry of "fraud" to get this court to uphold the judgment of the trial court erroneously rendered in his favor.

■ Counsel for appellee in his reply brief presents that there is a fundamental principle of law that when a seller contracts to deliver an article to a buyer and tenders him as a compliance with the contract an article which does not meet the terms but which the buyer accepts and retains, even under protest, the buyer is liable and bound by his acceptance.

Such proposition is unquestionably good law, but it has no application to the present case. No article was tendered to the Texas Company as a compliance with the terms of the contract which could have been returned to Walker.

As shown by the contract, Walker represented to Thomas, for the Texas Company, that certain geophysical work had been done and that substantial evidence of the existence of a salt dome underlying the area in question had been discovered by means of such geophysical methods; that Walker by the terms of the contract agreed to furnish the company all maps and information he possessed concerning the area. The maps furnished were not articles tendered as full compliance with the information which Walker agreed to furnish. As already abundantly shown by the undisputed evidence, such maps furnished no evidence, substantial or otherwise, of the existence of a salt dome at any place discovered by means of geophysical methods, or by any other method, such being the important information contracted for by the Texas Company.

There is neither allegation nor evidence that Walker delivered to appellant substantial evidence of the existence of a salt dome at any place discovered by means of geophysical methods, as he had agreed to do. It is apparent, however, that no verbal information which Walker attempted to deliver to appellee was an article, as that word is used in the law above stated, which could have been returned to Walker.

The majority of this court has reached the conclusion that the judgment rendered by the trial court should be reversed and judgment here rendered for appellant.

If we are in error in holding that the judgment should be reversed and judgment here rendered for appellant, then we sustain appellant's contention that the verdict of the jury and the judgment rendered thereon is so against and contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and therefore said judgment should be reversed and the cause remanded.

Associate Justice GRAVES dissents from the conclusions above expressed by the majority, but joins the majority in holding that if the judgment should not be reversed and rendered as held by the majority, it should be reversed and the cause remanded because of the refusal of the trial court to submit to the jury appellant's requested special issue No. 16A, inquiring whether or not W. R. Thomas, as agent of the appellant, after the execution of the contract on July 26 of 1927, told A. T. Feagin, in substance or effect, that the appellant would not carry out or perform it.

We have examined the many propositions presented by appellant for a reversal of the judgment, which we have not specially referred to or discussed, and we have reached the conclusion that the disposition we have made of this appeal in the discussion of the propositions above disposed of renders it unnecessary to encumber this opinion with a discussion of the remaining propositions.

Having reached the conclusions above expressed, the judgment of the trial court is re-

versed and judgment is here rendered, by the majority, for appellant, with Justice GRAVES dissenting as above indicated.

Reversed and rendered.

GRAVES, Justice (dissenting).

Substantially agreeing with the learned trial court's construction of the contract, as reflected in its submitted questions and other rulings, and failing to find any lack of sufficient supporting evidence for the various answers returned by the jury, I should regard the controlling fact issues of the controversy as now settled in favor of the judgment rendered below, but for this one omission:

The refusal of the trial court to submit to the jury appellant's requested special issue No. 16A, inquiring whether or not W. R. Thomas, as agent of the appellant, after the execution of the contract on July 26 of 1927, told A. T. Feagin, in substance or effect, that the appellant would not carry out or perform it.

A careful checking over of the testimony pro and con upon this issue clearly discloses that it raised the question so couched as one of fact for the jury, and that it was not otherwise submitted to or passed upon by them; it is true the court did submit almost precisely the same inquiry as applied to the appellee, L. Walker, himself, but in doing so was apparently under the impression that appellant had not become entitled to have the same thing elicited as affecting Feagin; because in its pleadings it had not declared upon any such notice having been given to Feagin that it would not go on with or perform the contract, but had confined it to the appellee himself; that is the state of appellant's pleadings, but in the circumstances attending, it was not thereby deprived of an affirmative right to have the question submitted of whether or not Walker received such notice either direct or through Feagin, for the reason that at the time thus inquired about—as shown by the undisputed testimony—Feagin was his partner in this contract and so remained until the late fall of 1928, hence notice to him was notice also to Walker; the rule of law upon this given state of the pleadings is thus declared by the Commission of Appeals in Jackson v. Dickey, 281 S. W. 1043, at page 1044:

"In 31 C. J., p. 1626, the sufficiency of a pleading to support a judgment in an action involving the relation of principal and agent is stated thus:

" 'It is a rule of pleading that, where a third party seeks to charge a principal with the act of his agent, the complainant may plead the act of the agent as such, or plead it as the act of his principal, and, unless otherwise provided by the codes or practice acts, it is not necessary, in pleading the act, to aver the fact of agency, it being sufficient to charge the act as that of the principal, without disclosing the fact of agency. And the rule that it is sufficient to allege the act of the agent as the act of the principal, without disclosing the fact of agency, is held to be applicable to actions ex delicto, as well as actions ex contractu.' "

That this requested inquiry related to a material matter—indeed, a vitally defensive one as pleaded by the appellant—is obvious; since, apparently from the face of the contract itself, it had the right at that time, that is, during the summer or early fall of 1928, which the testimony tends to show was the period during which the notice of refusal to go on with the contract was given, the appellant had the right to then elect not to perform it, none of the first four leases taken in the area involved having been then obtained, nor any other part of the contract executed; as indicated, supra, Feagin during all of that period was not only Walker's partner in interest in the contract itself, but he was also his agent and attorney, wherefore transactions with him relating thereto were equally binding upon the appellee.

As already indicated, the view here taken of the legal implications resulting from the contract itself and from the relations of the three parties thereto—that is, appellant, the appellee, and the latter's partner, agent and attorney, Feagin—is not different from that taken by the able trial court, who seems merely to have confined appellant to its having designated Walker direct alone as the one to whom such claimed notice of election not to carry out the contract was given; at any rate, the quoted holding upon that state of the pleadings seems to settle that matter the other way.

It is true there was some dispute upon the question as to whether or not such notice had ever been given to Feagin, as there was likewise under the same inquiry as affected Walker direct, which the jury answered in his favor—but there is no reasonable doubt that the testimony was sufficient to require its submission to the jury, the appellant in that particular being entitled to the benefit of all reasonable inferences from what it presented.

It seems to follow both from the general theory of the cause upon which it was tried

below and that herein proceeded upon, that if such binding notice in the circumstances then attending not to proceed further under the contract was so given to the appellee through his alter ego in the matter, Feagin, that an end to the controversy thereupon resulted; for that reason, the judgment, without so necessary a determination one way or another, should not be permitted to stand.

Without further discussion, it follows that, in my opinion, the judgment should be reversed and the cause remanded for a new trial.